# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| WASHINGTON STATE HOUSING FINANCE COMMISSION, a public body corporate and politic of the State of Washington,<br><br>                Respondent,<br><br>      v.<br><br>NATIONAL HOMEBUYERS FUND, INC., f/k/a Homebuyers Fund, Incorporated, a California nonprofit corporation; GOLDEN STATE FINANCE AUTHORITY, f/k/a California Home Finance Authority, f/k/a California Rural Home Mortgage Finance Authority, a California joint powers authority; RURAL COUNTY REPRESENTATIVES OF CALIFORNIA, f/k/a Regional Council of Rural Counties, f/k/a Mountain Counties Water Resources Association, a California nonprofit corporation,<br><br>                Appellants. | DIVISION ONE<br><br>No. 76510-8-I<br><br>UNPUBLISHED OPINION |

DWYER, J. — In 2015, the Washington State Housing Finance Commission (the Commission) filed a lawsuit against National Homebuyers Fund, Inc. (NHF) arguing that NHF is unlawfully invoking governmental authority in Washington and interfering with the Commission's housing programs. The trial court agreed and entered an order declaring NHF's activities in Washington unlawful and prohibiting it from engaging in the further provision of its home ownership financing services in Washington. On appeal, we reversed,

concluding that the Commission did not have standing.  Wash. State Hous. Fin. Comm'n v. Nat'l Homebuyers Fund, Inc. v., No. 76510-8-I, slip op. at 5 (Wash. Ct. App. Jun. 11, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/765108.pdf.  However, our decision was reversed by the Supreme Court, which remanded the case to us for consideration of its merits, specifically to determine "[w]hether NHF's activities in Washington are of the type that would require authorization from the legislature." Wash. State Hous. Fin. Comm'n v. Nat'l Homebuyer's Fund, Inc., 193 Wn.2d 704, 720, 445 P.3d 533 (2019) (hereinafter WSHFC).

On remand, NHF asserts that the operation of its housing program in Washington does not constitute activity of the type requiring authorization from the legislature.  Because NHF's operations in Washington require it to participate in the Federal Housing Administration (FHA) mortgage insurance program in Washington as a governmental entity acting in a governmental capacity, activity the Supreme Court concluded in its opinion requires authorization from our legislature, and NHF is not authorized to so participate by our legislature, we affirm the trial court's order declaring that NHF's program violates Washington law.

I

In 1983, responding to a shortage of affordable housing in Washington, our legislature established the Commission to make "additional funds available at affordable rates to help provide housing throughout the state."  LAWS OF 1983, ch. 161, § 1; RCW 43.180.010.  One of the Commission's ongoing programs "assists

low-income and first-time home buyers [in] qualify[ing] for a mortgage by lending them funds for the required down payment." WSHFC, 193 Wn.2d at 707-08. The Commission is explicitly authorized to offer such programs in conjunction with loans qualifying for mortgage insurance offered through federal housing programs, including the FHA's mortgage insurance program. RCW 43.180.050(1)(e).

NHF, on the other hand, was not created pursuant to a Washington statute. Instead,

> NHF is a California nonprofit public benefit corporation formed by Rural County Representatives of California (RCRC) and Golden State Finance Authority (GSFA). RCRC is a California nonprofit mutual benefit corporation founded by several counties in California to provide services to those counties and advocate on their behalf. GSFA is a joint powers authority created by these same counties to offer home ownership assistance to their residents. NHF was formed for the purpose of providing down payment assistance to low- and moderate-income home buyers throughout the United States.

WSHFC, 193 Wn.2d at 708.

NHF began operating a down payment assistance program in Washington in 2014. NHF's program in Washington partners with individual lenders to provide down payment assistance to home buyers in the form of nonrepayable gifts of up to five percent of the mortgage loan. NHF requires its partner lenders to obtain mortgage insurance for their loans through the FHA mortgage insurance program. As part of this process, the lenders must report to the FHA the source of any gifts provided to help pay for the borrower's down payment. When NHF's partner lenders reported to the FHA that NHF's gift funds came from a nonprofit organization, their loans were denied mortgage insurance. As a

3

result, NHF advised its partner lenders to report to FHA that their gift funds came from a governmental entity, which resulted in approval for FHA mortgage insurance. NHF also marketed itself as a governmental program.

The partner lenders also front the money for the nonrepayable gift. Then, the lenders sell the loans to a service provider partner, which also reimburses the lender for fronting the nonrepayable gift funds. The service provider partner then bundles the loans into mortgage securities, which it sells to NHF. In a separate transaction, NHF also reimburses the service provider for the gift funds that it paid to the lender. NHF then sells the mortgage securities it purchased on the open market for a profit.

Shortly after NHF began operating in Washington, the Commission began receiving inquiries from lenders who thought NHF was part of the Commission or had partnered with the Commission. The Commission became concerned that NHF was pretending to offer a government program and filed a lawsuit against NHF, RCRC, and GSFA on May 21, 2015. Therein, the Commission alleged that NHF was unlawfully invoking governmental authority in Washington and was thereby interfering with the Commission's programs. The Commission sought a declaration that NHF's activities in Washington are prohibited by law.

NHF unsuccessfully moved to dismiss the complaint. Following discovery, the parties filed cross motions for summary judgment. The trial court denied both motions, concluding that genuine issues of material fact remained to preclude summary judgment. However, upon the Commission's motion for reconsideration, the trial court granted summary judgment against NHF,

declaring that NHF's housing activities in Washington are prohibited by law.[1]

NHF appealed to this court,[2] which reversed, declining to reach the merits while concluding that the Commission did not have standing to bring its claims against NHF. Nat'l Homebuyers Fund, No. 76510-8-I, slip op. at 5. However, our Supreme Court, after granting a petition for review of that decision solely on the issue of whether the Commission had standing, concluded that the Commission did, indeed, have standing, reversed our decision, and remanded the matter to us for consideration of the remaining issues presented. WSHFC, 193 Wn.2d at 720.

II

RCRC and GSFA contend that the trial court erred by granting summary judgment against either of them, concluding that NHF's operation of its down payment assistance programs in Washington are in violation of Washington law, and prohibiting it from continuing to offer its housing assistance gift programs in Washington. This is so, NHF asserts, because (1) the trial court did not have personal jurisdiction over RCRC and GSFA, and (2) NHF's activities in Washington are not of the type requiring legislative authorization because it can administer its down payment assistance programs in Washington without purporting to be a governmental entity acting in a governmental capacity. [3]

---

[1] The order granting summary judgment, entered on February 24, 2017, did not specify a particular source of law that NHF's activities violated.

[2] NHF's notice of appeal sought review of numerous trial court orders, including discovery orders, but it did not assign error to most of these rulings in its briefing, thus waiving any arguments regarding those orders.

[3] Washington courts generally view the actions of governmental entities empowered to engage in a business activity as either governmental or proprietary, with governmental acts generally identified as those undertaken for the common good and proprietary acts generally identified as those undertaken for the specific benefit or profit of the entity. Skagit County Pub.

We review de novo the grant of a motion for summary judgment. Strauss v. Premera Blue Cross, 194 Wn.2d 296, 300, 449 P.3d 640 (2019). "'Summary judgment is appropriate when there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" Strauss, 194 Wn.2d at 300 (alteration in original) (internal quotation marks omitted) (quoting Ranger Ins. Co. v. Pierce County, 164 Wn.2d 545, 552, 192 P.3d 886 (2008)). "Similarly, a trial court's assertion of personal jurisdiction is a question of law that we review de novo, where, as here, the jurisdictionally relevant facts are undisputed." Failla v. FixtureOne Corp., 181 Wn.2d 642, 649, 336 P.3d 1112 (2014).

III

NHF contends that the trial court did not have personal jurisdiction over RCRC and GSFA, that the judgment against them must be reversed, and that the claims against them must be dismissed. We agree.

"Under Washington's long arm jurisdiction statute, RCW 4.28.185, personal jurisdiction exists in Washington over nonresident defendants and foreign corporations as long as it complies with federal due process." Noll v. Am. Biltrite Inc., 188 Wn.2d 402, 411, 395 P.3d 1021 (2017). "Thus, Washington

---

Hosp. Dist. No. 304 v. Skagit County Pub. Hosp. Dist. No. 1, 177 Wn.2d 718, 728-29, 305 P.3d 1079 (2013). However, the legislature may also specifically designate certain acts of governmental entities as governmental, even if they might otherwise appear to be proprietary. See Skagit County, 177 Wn.2d at 729 (concluding that provision of healthcare services to individuals for compensation is a governmental act for public hospital districts in rural areas because the legislature established that rural public hospital districts act in a governmental capacity when providing health care services). For example, herein the Commission's down payment assistance programs provide a revenue source for the Commission by offering loans to specific home buyers, but the legislature has specifically declared that providing such programs is a "recognized governmental function" of the Commission. RCW 43.180.010.

courts may exercise personal jurisdiction over a nonresident defendant so long as: (1) purposeful minimum contacts exist between the defendant and the forum state, (2) the plaintiff's injuries arise out of or relate to those minimum contacts, and (3) the exercise of jurisdiction is consistent with notions of fair play and substantial justice." Montgomery v. Air Serv Corp., 9 Wn. App. 2d 532, 538, 446 P.3d 659 (2019).

Washington courts may possess either general or specific personal jurisdiction over a defendant corporation or entity. Montgomery, 9 Wn. App. 2d at 539 (citing Noll, 188 Wn.2d at 412). The trial court herein possessed neither form of personal jurisdiction over RCRC and GSFA.

A

"A state court has general jurisdiction to decide any claim against a defendant corporation when the corporation's contacts with the state are so substantial that it is essentially at home in the forum state." Montgomery, 9 Wn. App. 2d at 539 (citing Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919, 131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011)). "A court with general jurisdiction may hear *any* claim against that defendant, even if all the incidents underlying the claim occurred in a different State." Bristol-Myers Squibb Co. v. Superior Court of California, ___ U.S. ___, 137 S. Ct. 1773, 1780, 198 L. Ed. 2d 395 (2017). Generally, "[a] defendant corporation is at home in the state of its incorporation and the state of its principal place of business. Additionally, in truly exceptional cases, a corporation's operations in a state may be of such a nature as to make it essentially at home therein even though the state is neither its state

7

of incorporation nor its principal place of business." Montgomery, 9 Wn. App. 2d at 540 (citation omitted) (citing BNSF Ry. Co. v. Tyrrell, ___ U.S. ___, 137 S. Ct. 1549, 1558, 198 L. Ed. 2d 36 (2017)).

Herein, it is undisputed that RCRC and GSFA are not incorporated in Washington and that their principal places of business are in California. Additionally, the record indicates that they do not conduct such extensive operations in Washington so as to be essentially at home in Washington. Therefore, the trial court did not have general personal jurisdiction over RCRC or GSFA.

B

A state court may also exercise specific jurisdiction "over a corporate defendant based on the defendant's claim-specific contacts with the forum state." Montgomery, 9 Wn. App. 2d at 540. "For a state court to exercise specific jurisdiction, there must be a connection between the forum state and the controversy." Montgomery, 9 Wn. App. 2d at 540 (citing Bristol-Myers Squibb 137 S. Ct. at 1781). "[T]he relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State." Walden v. Fiore, 571 U.S. 277, 284, 134 S. Ct. 1115 (2014) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)).

Herein, it is undisputed that RCRC and GSFA themselves have no connection to Washington. Thus, the trial court plainly would not have specific personal jurisdiction over RCRC and GSFA if they are separate, distinguishable, and independent from NHF. The Commission, however, asserts that NHF,

RCRC, and GSFA are actually not separate entities and are instead alter egos of one another, that piercing the corporate veil between them is required, and that personal jurisdiction over NHF therefore encompasses personal jurisdiction over RCRC and GSFA.

The parties do not agree as to which state's law to apply to determine whether NHF is the alter ego of RCRC and GSFA. NHF asserts that California law applies, while the Commission asserts that Washington law applies.[4] In Washington, courts determine which law applies by determining "which jurisdiction has the most significant relationship to a given issue." Singh v. Edwards Lifesciences Corp., 151 Wn. App. 137, 143, 210 P.3d 337 (2009) (citing Zenaida-Garcia v. Recovery Sys. Tech., Inc., 128 Wn. App. 256, 115 P.3d 1017 (2005)). Plainly, California has the most significant relationship to the issue of whether the corporate veil between NHF, RCRC, and GSFA must be pierced, as NHF and RCRC are incorporated in California and GSFA is a joint powers authority established by California counties in California. Therefore, we apply California law.

To establish the necessity of piercing a corporate veil, California law has two general requirements, "'(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow.'" Mesler v. Bragg Mgmt. Co., 39 Cal.3d 290, 300, 702 P.2d 601 (1985) (quoting Automotriz Del Golfo de California v. Resnick, 47

---

[4] However, all parties agree that the law is the same in all material respects.

9

Cal.2d 792, 796, 306 P.2d 1 (1957)).  While the parties dispute whether the first of these requirements is satisfied, it is apparent from the record that the second requirement is not met herein.  The entire case is about NHF's activities in Washington, and the Commission seeks only to end NHF's ongoing operations in Washington.  Because the trial court's injunction against NHF is sufficient to halt NHF's activities, the Commission fails to demonstrate a necessity to pierce the corporate veil between NHF, RCRC, and GSFA.[5]  Therefore, because RCRC and GSFA are not at home in Washington, they have no contacts with Washington, and are not the alter ego of NHF, we conclude that the trial court lacked personal jurisdiction over RCRC and GSFA.  The claims against them must be dismissed.

IV

NHF next contends that the trial court erred by granting summary judgment against it, concluding that NHF's operation of its down payment assistance programs in Washington is in violation of Washington law, and prohibiting it from continuing to operate its down payment assistance programs in Washington.  This is so, NHF asserts, because NHF's activities in Washington are not of the type requiring legislative authorization because it can administer its down payment assistance programs in Washington without purporting to be a governmental entity acting in a governmental capacity.  We disagree.

---

[5] This result would also obtain were we to apply Washington law.  See, e.g., Columbia Asset Recovery Grp., LLC v. Kelly, 177 Wn. App. 475, 486, 312 P.3d 687 (2013) (explaining that where full relief can be afforded, the need to pierce the corporate veil is not established).

A

Before reaching the arguments presented by the parties regarding NHF's operations in Washington, it is necessary to clearly set forth the boundaries of our review as provided to us by our Supreme Court. In its consideration of this case, the Supreme Court focused primarily on whether the Commission had standing to bring a lawsuit against NHF. WSHFC, 193 Wn.2d at 707. In so doing, the Supreme Court set the boundaries for our review on remand.

The court focused its inquiry on the Uniform Declaratory Judgments Act (UDJA), chapter 7.24 RCW, explaining that its broad statutory right to seek a declaration of rights under any statute is limited to those with standing—parties who can establish (1) "'the interest sought to be protected is arguably within the zone of interests to be protected or regulated by the statute,'" and (2) "'the challenged action has caused injury in fact, economic or otherwise, to the party seeking standing.'" WSHFC, 193 Wn.2d at 711-12 (internal quotation marks omitted) (quoting Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake, 150 Wn.2d 791, 802, 83 P.3d 419 (2004)). The court further noted that standing "is not intended to be a particularly high bar. Instead, the doctrine serves to prevent a litigant from raising another's legal right." WSHFC, 193 Wn.2d at 712 (citing Grant County, 150 Wn.2d at 802).

From there, the Supreme Court interpreted its prior case authority as stating that "a government entity granted authority to operate in a particular space has an interest against competition from others that lack the same authority." WSHFC, 193 Wn.2d at 714 (citing Skagit County Pub. Hosp. Dist. No.

304 v. Skagit County Pub. Hosp. Dist. No. 1, 177 Wn.2d 718, 723-30, 305 P.3d 1079 (2013); Alderwood Water Dist. v. Pope & Talbot, Inc., 62 Wn.2d 319, 382 P.2d 639 (1963)).  It then applied that conclusion to the Commission's authorizing statute, explaining that "[t]he legislature has delegated authority to the Commission to perform an essential governmental function *by participating in the FHA mortgage insurance program in a governmental capacity*.  As such, the Commission has an interest in preventing unauthorized actors from asserting similar authority."[6]  WSHFC, 193 Wn.2d at 714 (emphasis added) (citation omitted) (citing RCW 43.180.050(1)(e)).  Going a step further, the Supreme Court concluded that, although the Commission's authorizing statute itself sets forth no provision purporting to give the Commission exclusive authority to participate in federal housing programs as a governmental entity acting in a governmental capacity, "the Commission's interest against interference from competitors purporting to exercise such authority without authorization is implicit within its enabling act."  WSHFC, 193 Wn.2d at 716.  Thus, the Supreme Court concluded that the Commission had satisfied the first part of the standing test by establishing an interest arguably within the zone of interests protected by its enabling act.

The Supreme Court then proceeded to analyze whether the Commission also satisfied the injury in fact part of the standing test.  WSHFC, 193 Wn.2d at

---

[6] RCW 43.180.050(1)(e) states that the Commission is empowered to: Participate fully in federal and other governmental programs and to take such actions as are necessary and consistent with this chapter to secure to itself and the people of the state the benefits of those programs and to meet their requirements, including such actions as the commission considers appropriate in order to have the interest payments on its bonds and other obligations treated as tax exempt under the code.

717-18. The court concluded that the record established that the Commission had suffered some, not precisely quantifiable, economic injury and that the Commission had established reputational injury resulting from confusion arising from NHF's marketing of itself as governmental. WSHFC, 193 Wn.2d at 717.

Although concluding that the Commission had standing under the standard two part test, the Supreme Court further noted that even if the Commission had not successfully established standing under that test, the substantial public importance of the issues the Commission raised "would militate in favor of finding standing." WSHFC, 193 Wn.2d at 719. The court concluded that "impermissible interference with the Commission's ability to generate revenue through the mortgage insurance program would implicate the affordable housing and economic concerns the Commission was created to address," and that those concerns constituted issues of substantial public importance that should not escape review. WSHFC, 193 Wn.2d at 719.

Finally, after concluding that the Commission has standing pursuant to the UDJA, the Supreme Court declined to express any opinion on the other issues presented in the case. Instead, it remanded the cause to us to determine "[w]hether NHF's activities in Washington are of the type that would require authorization from the legislature." WSHFC, 193 Wn.2d at 720.

From the Supreme Court's ruling, it appears that it would be permissible for a Washington superior court to determine, in an action brought under the UDJA, that NHF's participation in the FHA mortgage insurance programs is unlawful because (1) its current participation in the FHA mortgage program in

Washington is of the type that requires legislative approval—meaning that NHF is participating in FHA's mortgage insurance program in Washington as a governmental entity acting in a governmental capacity—and (2) the legislature has not granted NHF the authority to participate in the FHA mortgage program in Washington as a governmental entity acting in a governmental capacity. Thus, the question presented for our review on remand is whether NHF's down payment assistance program in Washington is an activity of the type requiring legislative authorization, i.e,. whether NHF is participating in the FHA mortgage insurance program as a governmental entity acting in a governmental capacity.[7]

B

NHF contends that the trial court's order granting summary judgment and enjoining NHF from operating its down payment assistance programs in Washington must be reversed because its programs are not of the type that require authorization from the legislature. This is so, NHF asserts, because (1) under federal law and United States Department of Housing and Urban

---

[7] The issue presented for our review is not whether any of NHF's activity in Washington has violated federal law or FHA regulations, only whether NHF's participation in the FHA mortgage insurance program in Washington is an activity of the type requiring legislative authorization. As a result, we disregard the parties' arguments concerning whether NHF's programs in Washington violate the FHA's regulations barring a governmental entity from participating in the FHA mortgage insurance program outside of its territorial jurisdiction. This is so because our inquiry is focused on determining whether NHF has participated in the FHA mortgage insurance program in Washington as a governmental entity acting in a governmental capacity, not whether NHF has violated FHA regulations. The Supreme Court was clear that the Commission has standing to challenge whether NHF is claiming authority that it has not been granted by the legislature. WSHFC, 193 Wn.2d at 720.

Accordingly, this leads us to deny NHF's outstanding motion to take judicial notice of legislative facts set forth in the recent federal decision Cedar Band of Paiutes v. United States Dep't of Hous. & Urban Dev., No. 4:19-cv-30DN-PK, 2019 WL 3305919 (D. Utah July 23, 2019). NHF urges us to take judicial notice of facts therein pertaining to federal regulations regarding whether the FHA may impose jurisdictional limitations on governmental entities' down payment assistance programs. Because nothing in that decision is relevant to the question of whether NHF is participating in the FHA mortgage insurance program in Washington as a governmental entity acting in a governmental capacity, thereby violating Washington law, we deny the motion.

Development (HUD) regulations, programs such as NHF's down payment assistance program in Washington can be provided by governmental entities that are acting in a proprietary, rather than a governmental, capacity, and (2) NHF is a governmental entity that provides its down payment assistance program in Wasington in a proprietary capacity. In response, the Commission asserts (1) that NHF must be operating as a governmental entity acting in a governmental capacity when administering its down payment assistance programs in Washington because that is the only way the loans made in conjunction with NHF's gifts could qualify for FHA mortgage insurance, and (2) such operations require authorization from the legislature that NHF does not possess. The Commission has the better argument.

1

To properly evaluate whether NHF's activities in Washington require legislative authorization, we consider the regulatory scheme through which the FHA administers its home loan mortgage insurance program.

As a part of the National Housing Act, 12 U.S.C. §1709, Congress has established a mortgage insurance program, operated by the FHA, that "promotes home ownership for those who may not qualify for a conventional mortgage by protecting lenders against losses in the event the borrower defaults on the loan." WSHFC, 193 Wn.2d at 708. The loans are originated by FHA approved lenders, who are responsible for ensuring that the loans comply with detailed underwriting guidelines published by HUD. WSHFC, 193 Wn.2d at 708-09. See also 12 U.S.C. § 1709(a); FED. HOUSING ADMIN., DEP'T OF HOUSING & URBAN DEV., FHA

SINGLE FAMILY HOUSING POLICY HANDBOOK (2020)[8] (Handbook 4000.1) (FHA Handbook).[9]

The National Housing Act also requires that, for a loan to be eligible for federal mortgage insurance, the buyer must pay a minimum 3.5 percent down payment. 12 U.S.C. § 1709(b)(9)(A). Recognizing that buyers may not be able to meet this requirement on their own, the FHA permits buyers to obtain additional funding to meet the requirement in the form of a loan, also called secondary financing, or in the form of gifts to the buyer. FHA Handbook at 76, 235-36. Secondary financing may be provided by either governmental entities or HUD-approved nonprofits. FHA Handbook at 76. Gifts may only be provided by a buyer's family member, employer or labor union, close friend, charitable organization, or "governmental agency or public Entity that has a program providing homeownership assistance to: low or moderate income families; or first-time homebuyers." FHA Handbook at 235-36.

However, no part of the funds needed to pay the minimum required down payment, also referred to as a minimum cash investment or minimum required investment, can come from either "[t]he seller or any other person or entity that

---

[8] We cite to the current version of the Handbook, but note that the court has independently researched and determined that the pertinent provisions discussed herein have been in effect since prior to the entry of the trial court's order granting summary judgment in 2017.

[9] The parties argue about how authoritative the rules set forth in the policy handbook are. For purposes of this appeal, however, it makes no difference if the policy handbook rules have the force of law or not. We are not attempting to determine whether NHF has violated federal law. Instead, we are tasked only with determining whether NHF's down payment assistance program, as implemented, requires it to purport to be a governmental entity acting in a governmental capacity to qualify the loans provided in conjunction with its down payment assistance gifts for FHA mortgage insurance. Therefore, what matters is whether the FHA will provide federal insurance only to loans that comply with the rules set forth in the policy handbook. The parties agree, and the FHA Handbook itself states, that this is so.

16

financially benefits from the transaction" or "[a]ny third party or entity that is reimbursed, directly or indirectly" by a person or entity that financially benefits from the transaction. 12 U.S.C. § 1709(b)(9)(C)(i)-(ii). The FHA has further explained that this prohibited source provision bars "(1) the seller of the Property; (2) any other person or Entity who financially benefits from the transaction (directly or indirectly); or (3) anyone who is or will be reimbursed, directly or indirectly, by any party included in (1) or (2)" from providing any part of the funds for the buyer's minimum required investment. FHA Handbook at 231.

HUD, however, has concluded that "section 203(b)(9)(C) of the [National Housing Act] does not prohibit FHA from insuring mortgages originated as part of the homeownership programs of Federal, State, or local governments or their agencies or instrumentalities when such agencies or instrumentalities also directly provide funds toward the required minimum cash investment." FEDERAL HOUSING ADMINISTRATION: PROHIBITED SOURCES OF MINIMUM CASH INVESTMENT UNDER THE NATIONAL HOUSING ACT—INTERPRETIVE RULE, 77 Fed. Reg. 72,219, 72,222 (Dec. 5, 2012)) (Prohibited Source Rule). For purposes of this exception, HUD defines an agency or instrumentality of government as an entity that has been

> established by a governmental body or with governmental approval or under special law to serve a particular public purpose or designated as an instrumentality by law (statute or court opinion) and the majority of governing board and/or principal officers named or approved by governmental body/officials, or the government body approves all major decisions and/or expenditures, or the government body provides funds through direct appropriations/grants/loans, with related controls applicable to all activities of entity.

Prohibited Source Rule, 77 Fed. Reg. at 72,222 n.25.

The FHA has further clarified that the prohibited source rule does not "prohibit Governmental Entities, when acting in their governmental capacity, from providing the [buyer's] [minimum required investment] where the Governmental Entity is originating the insured Mortgage through one of its homeownership programs." FHA Handbook at 306.

2

NHF contends that it may administer its down payment assistance programs in Washington without purporting to be a governmental entity acting in a governmental capacity. This is so, NHF asserts, because it does not directly profit from the loan transactions it helps make possible through the provisioning of down payment assistance to buyers and it can, and does, therefore offer its down payment assistance programs in Washington in a proprietary, rather than a governmental, capacity. However, NHF concedes, and the record establishes, that NHF profits indirectly from the loan transactions it enables through the provision of its down payment assistance program, thus requiring it to be both a governmental entity and acting in a governmental capacity to obtain FHA mortgage insurance under FHA's rules. Because the record shows that the loans offered in conjunction with NHF's down payment assistance gifts in Washington have obtained FHA mortgage insurance, NHF must necessarily be causing its partner lenders to report to the FHA that NHF is a governmental entity acting in a governmental capacity. Thus, NHF's activities in Washington are necessarily of the type requiring explicit authorization from the legislature; NHF's

lenders are obtaining FHA insurance—on the loans in conjunction with which

NHF provides down payment assistance—that they could not obtain under FHA's

rules unless NHF was claiming the authority to participate in FHA's mortgage

program in Washington as a governmental entity acting in a governmental

capacity.

NHF asserts that the FHA's prohibited source rule does not apply to its

down payment assistance programs in Washington.  In so asserting, NHF does

not dispute that its down payment assistance program generates a profit through

the purchase and sale of mortgage securities comprised of loans made in

conjunction with NHF's provision of down payment assistance gifts.  Indeed, the

record shows that NHF conceded that it obtains an indirect financial benefit from

providing down payment assistance gifts because it purchases—and

subsequently sells on the open market for a profit—mortgage backed securities

comprised entirely of the loans that originated from NHF's partner lenders in

conjunction with NHF's down payment assistance program.[10]  However, NHF

asserts that the profit its program generates does not actually run afoul of the

prohibition against directly or indirectly profiting from the transaction because

"indirectly" profiting under the FHA rules does not include profits made from the

sale of mortgage backed securities on the secondary market.

In support of its assertion, NHF points specifically to the following

_____

[10] Additionally, when asked at oral argument whether 100 percent of the loans comprising the mortgage securities NHF purchases were originated by its partner lenders in conjunction with NHF's down payment assistance program, NHF's counsel explicitly confirmed that this is so. Wash. Court of Appeals oral argument, Wash. State Hous. Fin. Comm'n v. Nat'l Homebuyers Fund, Inc., et al., No. 76510-8-I (July 23, 2020), at 3 min., 33 sec. through 4 min., 4 sec.

statement in a memo from HUD deputy secretary Nani Coloretti: "the 'Prohibited Sources' provisions of the National Housing Act, captured at section 203(b)(9)(C) of the Act, are directed towards parties that financially benefit from the property sales transaction and the primary mortgage transaction, not transactions that occur in the secondary mortgage market." NANI COLORETTI, DEP'T OF HOUSING & URBAN DEV., MEMORANDUM RE: DECISION: OFFICE OF INSPECTOR GENERAL AUDIT OF NOVA FINANCIAL & INVESTMENT CORPORATION'S FHA-INSURED LOANS WITH DOWNPAYMENT ASSISTANCE, REPORT 2015-LA-0010, at 3 (May 25, 2016) (Coloretti Memo).

While this sentence may at first glance appear to suggest that the prohibited source rule permits profiting from the purchase and sale of mortgage securities containing loans made possible through the provision of down payment assistance gifts, the context of this memorandum suggests that the statement is applicable solely to governmental entities. The memo explicitly focused on "the interpretation and application of the National Housing Act 'Prohibited Sources' provisions to the downpayment assistance provided by a governmental entity." Coloretti Memo at 2. It analyzed only whether the FHA rules permitted lenders to allow governmental entities to provide down payment assistance in conjunction with their FHA insured loans when those governmental entities then subsequently purchased, and sold for a profit, mortgage securities containing those loans. Coloretti Memo at 3-4. The memo specifically noted that "there are no restrictions placed on governmental entities in how they elect to raise funds for their respective downpayment assistance programs. The subsequent sale of

the mortgage on the secondary market is a permissible source of funds for a governmental entity's downpayment assistance program." Coloretti Memo at 4 n.1. We view the memo's broad statement regarding the prohibited sources rule in the context of the types of entities which the Coloretti Memo was discussing: governmental entities.[11] For nongovernmental entities, we conclude that the purchase and sale of mortgage securities containing loans offered in conjunction with down payment assistance can qualify as indirectly benefitting from the loan transaction.[12] Thus, unless NHF is a governmental entity, the prohibited source rules would bar it from obtaining federal mortgage insurance from the FHA on loans offered in conjunction with NHF's down payment assistance gifts.

NHF asserts that it qualifies as a governmental entity for the purposes of whether it must comply with FHA's prohibited source rules. This is so, NHF avers, because the FHA Handbook states that entities classified by the IRS as Section 115 entities under the Internal Revenue Code are treated as

---

[11] We also adopt such an interpretation because it complies with the general interpretive principle that courts, when considering potentially inconsistent regulations or statutes, should "harmonize them when possible." Preserve Our Islands v. Shorelines Hr'gs Bd., 133 Wn. App. 503, 525, 137 P.3d 31 (2006) (citing Philippides v. Bernard, 151 Wn.2d 376, 385, 88 P.3d 939 (2004)). Our interpretation brings the memo into alignment with the rules set forth in the FHA Handbook, which allow only governmental entities acting in a governmental capacity to profit directly or indirectly from the provision of down payment assistance. See FHA Handbook at 306 (noting that government entities acting in governmental capacity are not bound by the prohibited source rules). Furthermore, the court has independently researched and determined that the pertinent FHA Handbook provisions regarding the applicability of the prohibited source rule to governmental entities in the 2020 version of the FHA Handbook is substantively identical to the provisions in effect prior to the publication of the Coloretti Memo. Therefore, the memorandum plainly did not supersede or modify the FHA Handbook provisions regarding the prohibited source rule.

[12] We further note that the record herein supports such an interpretation. When NHF's partner lenders applied for FHA mortgage insurance and classified NHF's gift assistance funds as originating from a nonprofit, the applications for mortgage insurance were denied. Thus, the FHA plainly does not permit nongovernmental entities to profit indirectly from the loan transaction through the sale of bundled mortgage backed securities comprised of loans offered in conjunction with those entities' down payment assistance gifts.

governmental entities for the purposes of providing secondary financing and the IRS classifies NHF as a Section 115 entity. While NHF is correct that the FHA Handbook so states, that definition applies in the context of determining whether an entity requires FHA approval to participate in FHA nonprofit programs offering secondary financing to home buyers. See FHA Handbook at 77-78 ("HUD deems Section 115 Entities, as identified in Section 115 of the Internal Revenue Code, to be Instrumentalities of Government for the purpose of providing secondary financing."). Again, for the purposes of determining whether an entity is bound by the prohibited source rules, HUD has stated that an entity is a governmental entity only when

> established by a governmental body or with governmental approval or under special law to serve a particular public purpose or designated as an instrumentality by law (statute or court opinion) and the majority of governing board and/or principal officers named or approved by governmental body/officials, or the government body approves all major decisions and/or expenditures, or the government body provides funds through direct appropriations/grants/loans, with related controls applicable to all activities of entity.

Prohibited Source Rule, 77 Fed. Reg. at 72,222 n.25.

The record shows that NHF does not qualify as a governmental entity under this definition. While the record is silent as to whether NHF was established with governmental approval, the record does show that (1) NHF was established by RCRC and GSFA instead of a governmental body, (2) NHF's governing board was named by RCRC instead of by any governmental body, (3) NHF makes financial decisions on its own, and (4) NHF generates its own funding. Because NHF does not qualify as a governmental entity, the FHA's

prohibited source rules are plainly applicable to NHF's programs.

Applying the prohibited source rules, it is apparent that, because NHF indirectly profits from providing down payment assistance gifts by selling the resulting insured loans on the secondary mortgage market, loans offered in conjunction with NHF's down payment assistance programs should not qualify for FHA mortgage insurance. Furthermore, even if NHF qualified as a governmental entity for purposes of the prohibited source rules, the FHA Handbook is clear that the exception to the prohibited source rules for governmental entities applies only when they are acting in their governmental capacity. FHA Handbook at 306. Even if NHF qualified as a governmental entity, it concedes that it could not act in a governmental capacity in Washington. Therefore, FHA's prohibited source rules apply to NHF's down payment assistance programs and the FHA would refuse to insure loans offered in conjunction with NHF's programs if NHF's lenders properly reported that NHF was a nonprofit organization acting in a proprietary capacity when providing down payment assistance.

It is undisputed, however, that NHF has been successfully obtaining FHA mortgage insurance for the loans offered in conjunction with its down payment assistance gift program. Because, (1) absent NHF claiming to be a governmental entity acting in a governmental capacity, the loans offered in conjunction with NHF's down payment assistance gifts would violate the FHA's prohibited source rules and be denied federal mortgage insurance, and (2) the FHA has provided mortgage insurance to loans offered in conjunction with NHF's down payment assistance gifts, NHF *must* be claiming to participate in FHA's

mortgage insurance program as a governmental entity acting in a governmental capacity. Otherwise, the loans offered with their programs would never successfully obtain federal mortgage insurance.

Indeed, the record strongly supports this analysis. When NHF's partner lenders informed FHA that NHF provided down payment assistance as a nonprofit, the FHA refused to insure those loans. Only when NHF informed its partner lenders that their loans would be approved if they reported NHF's funds as governmental, and the lenders began so reporting, did the loans offered in conjunction with NHF's gifts successfully obtain FHA mortgage insurance.

NHF concedes that it lacks the authority to participate in FHA's mortgage insurance program in Washington in a governmental capacity, but NHF has necessarily been acting as if it is a governmental entity operating in a governmental capacity in order to obtain FHA mortgage insurance on loans from which it indirectly financially benefits. Our Supreme Court has concluded that engaging in such activity in Washington without authorization from our legislature violates RCW 43.180.050(1)(e) and its implicit guarantee that only those authorized, such as the Commission, may participate in the FHA mortgage insurance program as a governmental entity acting in a governmental capacity. See WSHFC, 193 Wn.2d at 714. Thus, the trial court's conclusion that NHF is violating Washington law is correct, and its order barring NHF's continued

operation of its down payment gift assistance program in Washington was proper.[13]

Accordingly, we affirm the trial court's summary judgment order as against NHF, but reverse and remand for dismissal of all claims against RCRC and GSFA.[14]

Affirmed in part, reversed in part.

_Dwyer, J._

WE CONCUR:

_____          _Leach, J._

---

[13] Because the record already contains sufficient information to resolve this issue, we deny the Commission's outstanding motion to take judicial notice of the application form utilized by NHF's lenders to apply for FHA mortgage insurance.

[14] Because we affirm the trial court's order on the basis that NHF is engaging in activity requiring authorization from our legislature, we need not consider the parties' other arguments regarding whether NHF has the authority under California law to operate in Washington in a proprietary capacity. Whether NHF has the authority to act in a proprietary capacity outside of California is irrelevant because NHF's down payment assistance program in Washington, the only NHF operation at issue in this litigation, is *necessarily* offered in a governmental capacity to enable NHF's lenders to secure FHA mortgage insurance. NHF concedes that it has no authority to operate in a governmental capacity in Washington and its authority to act in a proprietary capacity is not germane. Thus, we decline to consider whether California law authorizes NHF to act in a proprietary capacity in Washington.

25