# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| BUILDING INDUSTRY ASSOCIATION OF WASHINGTON, a Washington non-profit organization, | No. 54987-5 -II |
| Appellant, | |
| v. | |
| JAY INSLEE in his official capacity as WASHINGTON STATE GOVERNOR, THE STATE OF WASHINGTON, and the WASHINGTON STATE DEPARTMENT OF FISH AND WILDLIFE, | UNPUBLISHED OPINION |
| Respondents. | |

WORSWICK, J. — The Building Industry Association of Washington (BIAW) sought

declaratory relief to challenge the Governor's partial veto of an environmental protection bill.

The trial court ruled that BIAW lacked standing and granted summary judgment in favor of the

Governor. BIAW argues that it has standing to bring its claim because the uncertainty created by

the veto amounts to an injury in fact. We hold that BIAW does not have standing; thus, we

affirm.

FACTS

I. CHINOOK SALMON ABUNDANCE LEGISLATION

In 2018, Governor Jay Inslee issued Executive Order 18-02, which, among other things,

created the Southern Resident Killer Whale Task Force made up of some 50 public and private

sector stakeholders and representatives. The Task Force was created in response to a deteriorating water ecosystem in the Pacific Northwest that was threatening the endangered orca whales. The Task Force's primary goals were to increase Chinook salmon populations; decrease risks and exposure from vessels on orcas; reduce orca exposure to contaminants; and ensure that funding, information, and accountability mechanisms were put in place to support effective implementation.

The Task Force issued a report with recommendations for the Washington State Departments of Fish and Wildlife (WDFW), Natural Resources (DNR) and Ecology. Those recommendations included enhancing WDFW's civil penalty statute (Former RCW 77.55.291 (2018), *repealed by* LAWS of 2019, ch. 290, § 14) to raise the penalty amount and provide the WDFW with "enforcement tools equivalent to those of local governments, Ecology and DNR."[1]

In 2019, the House introduced House Bill (HB) 1579 to implement the recommendations of the Task Force. HB 1579 gave WDFW enhanced authority to enforce the Washington State Hydraulic Code and increased the civil penalty amount from up to $100 per day for violations to "penalties of up to ten thousand dollars for every violation of [RCW 77.55] or of the rules that

---

[1] For example, DNR and Ecology are authorized to levy penalties of up to $10,000 per day for violations of forest practice statutes and regulations, hazardous waste laws and regulations, and clean air laws and regulations. RCW 76.09.170, RCW 70A.300.090, RCW 70A.15.3160(1)(a).

implement [RCW 77.55]."[2] Clerk's Papers (CP) at 353; Former RCW 77.55.291 (2018).[3]

Throughout the drafting process in the House, the ten thousand dollar penalty amount was

consistent in each version of HB 1579.[4]

After arriving in the Senate, HB 1579 was taken up by the Agriculture, Water, Natural

Resources & Parks Committee. The bill passed through that Committee with an amendment that

had two components relevant here.

First, the amendment added Section 13, which created and funded three dredging projects

to aid in floodplain management strategies in three counties across Washington. SECOND

SUBSTITUTE H.B. 1579, § 13, 66th Leg., Reg. Sess. (Wash. 2019). Section 13 was not part of the

Task Force recommendations and was not designed to effectuate any of the goals of the Task

Force. Instead, Section 13 was re-introduced legislation that Senator Hobbs had previously

sponsored but had failed to pass in the House as a stand-alone bill.

---

[2] The Hydraulic Code requires preauthorization and permitting from WDFW before undertaking certain projects affecting State waters. *See, e.g.*, WAC 220-660-290 (requiring advance authorization for certain bodies of water due salmon spawning areas). Before engaging in a project, builders can first obtain technical assistance and pre-construction determinations from WDFW to determine compliance with the Code. WAC 220-660-480(1); *Technical Assistance Program*, WASHINGTON DEPARTMENT OF FISH AND WILDLIFE: HYDRAULIC PROJECT APPROVAL (HPA) (March 29, 2021, 10:00 AM), https://wdfw.wa.gov/licenses/environmental/hpa/application/assistance.

[3] Section 14 of HB 1579 repealed former RCW 77.55.219 (2018), which granted WDFW authority to impose penalties for code and statutory violations.

[4] (H.B. 1579, § 7, 66th Leg., Reg. Sess. (Wash. 2019)); 366 (SUBSTITUTE H.B. 1579, § 8, 66th Leg., Reg. Sess. (Wash. 2019)); 379-380 (SECOND SUBSTITUTE H.B. 1579, § 8, 66th Leg., Reg. Sess. (Wash. 2019)).

Second, the amendment added Subsection 8(1)(a) which provided that if Section 13 was not enacted, the maximum penalty WDFW would be able to impose would revert to the original $100 per day. SECOND SUBSTITUTE H.B. 1579, § 8, 66th Leg., Reg. Sess. (Wash. 2019). Subsection 8(1)(a) states:

> If section 13 of this act is enacted into law by June 30, 2019, the department may levy civil penalties of up to ten thousand dollars for every violation of [RCW 77.55] or of the rules that implement [RCW 77.55]. If section 13 of this act is not enacted into law by June 30, 2019, the department may levy civil penalties of up to one hundred dollars for every violation of this chapter or of the rules that implement this chapter. Each and every violation is a separate and distinct civil offense.

CP at 392, 416.[5]

The amendment did not affect the remaining portion of Subsection 8, which governed the WDFW penalty process.[6] The Senate and the House passed Second Substitute Senate House Bill (2SHB) 1579 as amended by the Senate. 2SHB 1579 was transmitted to the Governor for signature or veto.

Governor Inslee vetoed two provisions of 2SHB 1579: Section 13 and Subsection 8(1)(a). Governor Inslee released a public statement asserting that Section 13 was unconstitutional for

---

[5] The original HB 1579 conferred authority on WDFW to impose civil penalties of up to ten thousand dollars. *See* H.B. 1579, § 7, 66th Leg., Reg. Sess. (Wash. 2019).

[6] WDFW has codified other enforcement and quasi-enforcement mechanisms other than civil penalties, including compliance inspections, WAC 220-660-480(3), correction requests, (4), stop work orders, (5), and notices to comply, (6).

being beyond the title and scope of the bill.[7]  Governor Inslee also asserted the Legislature intentionally attempted to "circumvent and impede" the Governor's "veto authority by entangling an unrelated and unconstitutional provision within a recommendation of the task force" by including contingency language in Subsection 8(1)(a).  CP at 52-53.  Governor Inslee signed the bill as amended and directed the WDFW to undertake rulemaking to effectuate the statute and to establish a maximum civil penalty not to exceed ten thousand dollars for every violation, as established in the original bill.

The Legislature did not override the Governor's veto and 2SHB 1579, as passed by the House and Senate and vetoed by the Governor became Laws of 2019, Chapter 290.[8]

## II.  PROCEDURAL HISTORY

After passage of 2SHB 1579, the BIAW requested that WDFW engage in emergency rulemaking to (1) repeal all existing rules based upon RCW 77.55.291 (the rulemaking authority for establishing civil penalties, repealed by 2SHB 1579), and (2) to decline Governor Inslee's directive to engage in rulemaking to establish civil penalties.[9]  The WDFW denied BIAW's requests, reasoning in part that 2SHB 1579 as vetoed was presumed to be constitutional, and that

---

[7] Article II section 19 of the Washington Constitution forbids passage of any bill that "embrace[s] more than one subject," and those that are not "expressed in the title."  "Logrolling," where legislators "attach unpopular laws to popular laws in order to gain approval for legislation that would not otherwise pass," is unconstitutional.  *Wash. Ass'n for Substance Abuse & Violence Prevention v. State*, 174 Wn.2d 642, 674-75, 278 P.3d 632 (2012).   The parties do not dispute that Section 13 is unconstitutional.

[8] Chapter 290 is codified in RCW 77.55.

[9] The Building Industry Association of Washington (BIAW) is a nearly 8,000 member, nonprofit trade association that advocates for and litigates on behalf of homebuilders before the Washington State government.  BIAW members represent all aspects of home building, including projects in coastal areas.

repeal of RCW 77.55.291 did not eliminate WDFW's statutory authority to adopt rules and impose civil penalties to enforce the RCW 77.55. WDFW did, however, agree not to enforce any penalties under RCW 77.55 until it implemented final rules under 2SHB 1579.[10]

BIAW then filed this action in July, 2019, seeking mandamus, injunctive, and declaratory relief against Governor Inslee and WDFW. BIAW later voluntarily dismissed all its claims except for declaratory relief regarding the constitutionality of the Governor's veto of Subsection 8(1)(a), and mandamus relief to require WDFW to act as if Subsection 8(1)(a) had not been vetoed. The parties filed cross-motions for summary judgment. The Governor and the WDFW argued, among other things, that BIAW lacked standing.

A.       *Roberts Declaration*

In support of its motion for summary judgment, BIAW attached a declaration from Jay Roberts. Roberts is a vice president and co-owner of a home building company on Whidbey Island and a member of BIAW. In his declaration, Roberts explained that 2SHB 1597 as vetoed by the Governor creates uncertainty as to the penalty structure for hydraulic permitting, which has negative effects on his business. His declaration states:

> Under [2SHB] 1579, the uncertainty and risk sky rocket for my clients. Because of the Governor's veto, there appears to be no fine authority contained in the bill. However, the Department has said they intend to enter into rulemaking as if they do have fine authority. Without a statutory basis, and especially considering the Governor's suggestion that the Department institute $10,000 fines, I have no idea how high the fines could go. I believe it is my duty to inform potential clients that the fines are likely to be higher and the delay is more unpredictable now that [2SHB] 1579 has become law. Based on my knowledge and experience, this will lead clients to abandon projects that they would have otherwise pursued.

---

[10] Civil penalties for violations of chapter 77.55 RCW are codified at WAC 220-660-480(7), and (8).

. . .

>If the fines jump to $10,000, as the Governor suggested, each project I take on creates a catastrophic risk for my company.

. . .

>If the fines jump to the $10,000 amount suggested, they create risk [that] is too great to put on my company and I will have no choice but to refuse to take on projects that are even remotely related to water, a big cost to a Whidbey Island company.

>If rules creating a $10,000 fine are implemented, my business will be irreparably harmed.

>If the Department's authority to issue fines is not clarified, my business will be irreparably harmed.

CP at 186-87. Roberts did not claim to have lost a particular client or suffered any specific financial hardship as a result of the Governor's veto.

B.    *Himebaugh Declaration*

BIAW also attached a declaration from Jan Himebaugh in support of its motion. Himebaugh is the Government Affairs Director for BIAW. Himebaugh explained that the *Spokane County* decision is a cause of uncertainty and interruption in the bidding and budgeting process for homebuilder projects.[11]  Himebaugh also explained that uncertain regulatory risks can cause contractors to lose business because potential clients are not willing to take the risk of high or uncertain fines. Himebaugh's declaration neither mentioned the Governor's partial veto of 2SHB 1597 nor referenced the legislation at issue in this case.

---

[11] *Spokane County v. WDFW*, 192 Wn.2d 453, 455, 430 P.3d 655 (2018), held that hydraulic projects under Chapter 77.55 RCW were within the regulatory jurisdiction of WDFW even when they are above the ordinary high-water line affecting state waters.

C.  *Trial Court Decision*

The trial court ruled that BIAW did not have standing, granted summary judgment in favor of the Governor and WDFW, and dismissed BIAW's action with prejudice. The WDFW later adopted final rules that became effective June 12, 2020.[12]

D.  *Petition for Review and Appeal*

BIAW petitioned our Supreme Court to review the trial court's order granting Governor Inslee and the WDFW's motion for summary judgment and the denial of its motion for summary judgment. A group of senators filed a brief in support of BIAW. Br. for BIAW by Amici Curiae Senators. Our Supreme Court declined to accept review and remanded to us for consideration as a direct appeal. Order, *Building Indus. Assoc. of Wash. v. Jay Inslee*, No. 98119-1 (Wash. S. Ct., July 8, 2020).

ANALYSIS

BIAW argues that it has standing under the Uniform Declaratory Judgments Act (UDJA) to obtain declaratory relief to resolve the constitutionality of the Governor's veto of Subsection 8(1)(a). It argues that the consequences of the Governor's veto of Subsection 8(1)(a) amounts to an injury in fact because the veto created uncertainty and insecurity for its members due to the WDFW's theoretical ability to enact much higher penalties than under the prior version of the statute. BIAW further urges us to adopt a new rule and hold that "those who are governed by a law that was unconstitutionally created have suffered sufficient harm to challenge that law, even before the effect of the law is felt." Br. of Appellant at 19. Alternatively, BIAW argues that this

---

[12] Under WAC 220-660-480(7)(a), the WDFW may levy civil penalties up to ten thousand dollars.

case is "of great public importance" and is resolvable on adequate briefing by the parties. Br. of Appellant at 24.

The Governor and the WDFW argue that BIAW does not have standing because it has not shown that it suffered an injury in fact where the speculative possibility of a higher penalty is too uncertain to be cognizable by this court, and the issue involved here is not of broad overriding import to merit our consideration.

We agree with the Governor and the WDFW and hold that BIAW has not demonstrated that the Governor's veto of Subsection 8(1)(a) has caused them an injury in fact. We decline BIAW's invitation to adopt a relaxed standard of justiciability, and we disagree with BIAW that this case presents an issue of great public importance to warrant proceeding to the merits. Consequently, we affirm.

A.      *Legal Principles and Standard of Review*

When a party seeks declaratory relief, the UDJA, chapter 7.24 RCW, provides that "[a] person . . . whose rights, status or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status or other legal relations thereunder." RCW 7.24.020. To clarify the boundary of this statutory right, we recognize the common law doctrine of standing, which holds that a litigant is prohibited from raising another's legal right to question the validity of a statute. *Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake*, 150 Wn.2d 791, 802, 83 P.3d 419 (2004) (*Grant County* II). Allegations of harm must be "personal to the party" and "substantial rather than speculative or abstract." *Grant County* II, 150 Wn.2d at 802. Standing under the UDJA is not meant to be a particularly high bar, however. *Wash. State Hous. Fin. Comm'n v.*

9

*Nat'l Homebuyers Fund, Inc.*, 193 Wn.2d 704, 712, 445 P.3d 533 (2019). The UDJA is liberally construed and administered. RCW 7.24.120.

Our Supreme Court has established a two-part test to determine whether there is standing to bring a claim under the UDJA. *Wash. State Hous. Fin. Comm'n*, 193 Wn.2d at 711. First, the interest sought to be protected must be "'arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Wash. State Hous. Fin. Comm'n*, 193 Wn.2d at 711-12 (quoting *Grant County* II, 150 Wn.2d at 802). Second, the challenged action must have caused an "'injury in fact,' economic or otherwise, to the party seeking standing." *Wash. State Hous. Fin Comm'n*, 193 Wn.2d at 712 (quoting *Save a Valuable Env't v. City of Bothell*, 89 Wn.2d 862, 866, 576 P.2d 401 (1978)). Standing is a question of law we review de novo. *Wash. State Hous. Fin. Comm'n*, 193 Wn.2d at 711.

The parties do not dispute that the first step in the UDJA standing test has been met: whether the interest sought to be protected is arguably within the zone of interests to be regulated by the statute in question. Thus, we consider only the second part of the test: whether or not BIAW has suffered an injury in fact.

B. *Insecurity and Uncertainty*

BIAW argues that the insecurity and uncertainty of its members regarding how the WDFW will institute penalties given the Governor's veto of Subsection 8(1)(a) constitutes an injury in fact. We disagree.

The injury in fact test under the UDJA turns on whether a plaintiff has suffered an actual injury. *Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake*, 145 Wn.2d 702, 713, 42 P.3d 394 (2002), *vacated on other grounds,* 150 Wn.2d 791, 83 P.3d 419 (2004) (*Grant County* I).

Where the alleged harm is threatened but has not yet occurred, the plaintiff must show that "'the injury will be immediate, concrete, and specific; a conjectural or hypothetical injury will not confer standing.'" *Knight v. City of Yelm*, 173 Wn.2d 325, 341, 267 P.3d 973 (2011) (addressing injury in fact for standing under the Land Use Petition Act) (quoting *Suquamish Indian Tribe v. Kitsap County*, 92 Wn. App. 816, 829, 965 P.2d 636 (1998)). A plaintiff whose financial interests are affected by an action have suffered an actual injury. *Grant County* I, 145 Wn.2d at 713. "The interests of the [plaintiff] are not theoretical; they involve actual financial constraints imposed upon the [plaintiff] by the challenged system itself." *Seattle Sch. Dist. No. 1v. State*, 90 Wn.2d 476, 493, 585 P.2d 71 (1978).

Where anticipated financial loss is contingent upon intervening events, a showing of direct or substantial injury threatened or suffered must include proof that such events are not so remote or uncertain as to be less than immediate. *See To–Ro Trade Shows v. Collins*, 144 Wn.2d 403, 27 P.3d 1149 (2001) (holding no injury in fact where alleged financial loss suffered by trade show company from licensure enforcement depended on unsubstantiated customer preference for unlicensed RV dealers); *Wash. Beauty Coll., Inc. v Huse*, 195 Wash. 160, 80 P.2d 403 (1938) (holding no injury in fact where alleged financial loss to hairdresser school from licensure requirement affecting students without a high school education where contracts from such students were not identified). BIAW provides no controlling authority for its argument that "insecurity and uncertainty" amount to an injury in fact, but argues that *Clinton v. City of N.Y.*, 524 U.S. 417, 431, 118 S. Ct. 2091, 141 L. Ed. 2d 393 (1998), the case striking down the federal line-item veto, is instructive on this issue.

In *Clinton*, the President of the United States vetoed section 4722(c) of the Balanced Budget Act of 1997, which revived an estimated $2.6 billion liability against the State of New York payable to the federal government for recouping federal Medicaid payments equal to impermissible State tax revenues on subsidized healthcare facilities. 524 U.S. at 422. New York State law automatically extended that liability to the hospital systems throughout the state, including the plaintiff City public healthcare system. *Clinton*, 524 U.S. at 426. The vetoed section lobbied by the State of New York and passed by Congress was set to specifically resolve the tax dispute between the State of New York and the federal government, and so also would have negated the liability between the City and the State as a result. *Clinton*, 524 U.S. at 422. The plaintiff City, through its State, requested waivers from the federal government to reduce its tax burden, but the federal Department of Health and Human Services (HHS) took no action on the requests. *Clinton*, 524 U.S. at 422.

The President argued that because the City's public healthcare system could someday obtain a waiver, this was enough to render the claimed injury merely speculative. *Clinton*, 524 U.S. at 430. The Court disagreed and held that the City did have standing notwithstanding its failure to obtain a waiver. *Clinton*, 524 U.S. at 430. The Court reasoned that the legislation was akin to a defense verdict in a multibillion dollar damages claim and the President's veto was analogous to an appellate court setting aside that verdict and remanding for a new trial. *Clinton*, 524 U.S. at 430-31. That the defendant might someday obtain the same judgment again when it retries its case does not undo the immediate injury the defendant has suffered by being deprived of a favorable final judgment. *Clinton*, 524 U.S. at 431. The City's tax liability was both concrete and measurable. *Clinton*, 524 U.S. at 430-31. The Court found the City had sustained

12

injury because revival of the contingent tax liability "immediately and directly affects the borrowing power, financial strength, and fiscal planning of the potential obligor." *Clinton*, 524 U.S. at 431.

Unlike the City in *Clinton*, BIAW has not presented any concrete figures or calculations that inform us what constitutes its "insecurity and uncertainty." Unlike *Clinton*, the vetoed provision here is not tied to any specific financial obligation. Rather, BIAW's claims are based on hypothetical business loss and some future, unidentified clients' reluctance to enter into contracts. The plaintiff in *Clinton* traced the effect of the veto directly to its balance sheet. BIAW, on the other hand, has not presented any losses or raised any facts about the actual effects on its borrowing power, its financial strength, or its ability to conduct fiscal planning as discussed in *Clinton*. Further, the liability in *Clinton* was contingent on HHS's decision to not act on any of the plaintiff's waiver requests, which is significantly less attenuated than the WDFW's future discretionary rulemaking authority and the decision of hypothetical customers to forgo a homebuilding project. *Clinton* does not support BIAW's argument that it suffered an injury in fact.

To have standing, parties' financial interests must be affected by the outcome of a declaratory judgment action. *Yakima County (W. Valley) Fire Prot. Dist. No. 12 v. City of Yakima*, 122 Wn.2d 371, 379, 858 P.2d 245 (1993). There must also be some amount of certainty of harm to that financial interest to support standing in such a case. *Yakima County*, 122 Wn.2d at 379-80. For example, in *Yakima County*, our Supreme Court held that the Fire District lacked an injury in fact when that injury related to possible future public land annexations. 122 Wn.2d at 379-80. The Fire District argued that its financial interests were

affected by the validity of certain contracts where those contracts required landowners to sign a petition for annexation of the property to the City of Yakima. *Yakima County*, 122 Wn.2d at 379.

In holding that the Fire District did not have standing because its financial interests were not affected, the court reasoned that the outcome of the declaratory judgment action did not affect the financial interests of the Fire District directly because multiple determinative contingencies and intermediary steps still had to occur, even though holding the contracts to be valid would make annexation easier. *Yakima County,* 122 Wn.2d at 380. In that case, even if the contracts were determined to be valid, no annexation of the Fire District's land could possibly occur unless other third-party landowners in the area first also signed their own petitions. *Yakima County*, 122 Wn.2d at 380. After that, an overwhelming majority of landowners in the area would need to decline an administrative review to avoid another third-party approval process by a review board. *Yakima County*, 122 Wn.2d at 380.

Here, BIAW has raised no more than a theoretical injury. Every claimed harm in each of BIAW's declarations has conditional language with accompanying future tense verbs, e.g., "*If* the Department's authority to issue fines is not clarified, my business *will be* irreparably harmed." CP at 187 (emphasis added). These claims only raise a specter of some future and undetermined financial harm. BIAW has not shown that the "insecurity and uncertainty" allegedly caused by the Governor's veto is a threat to their financial interests because they have not proffered evidence that the injury will be "immediate, concrete, and specific."

None of the declarations show any particular contract, customer, or business that will be lost, for example. Roberts says his business will be harmed when "the fines are likely to be

14

higher and the delay is more unpredictable now that [2SHB] 1579 has become law," because he says he has a duty to inform his customers of what the penalties could be. CP at 186. Roberts' prediction is simply not concrete or specific enough for us to consider it an injury in fact.

Like *Yakima County*, BIAW's financial interests are not necessarily affected by the challenged provision: the validity of the Governor's veto of Subsection 8(1)(a). The validity of the challenged provision here is similarly not "determinative." *Yakima County*, 122 Wn.2d at 380. Similar to the intermediary steps in the annexation process in *Yakima County*, here there are several intermediary steps before BIAW can show injury: the outcome of WDFW's rule making process, the manner in which WDFW enforces compliance, and future customer's willingness to hire BIAW members.

For any such fine to be imposed, BIAW members would first have to engage in a covered construction project after not availing themselves of WDFW's preconstruction determination process or technical support for whether they are engaging in the type of project that needs project approval. WAC 220-660-020, 480(1); *Technical Assistance Program*, WASHINGTON DEPARTMENT OF FISH AND WILDLIFE: HYDRAULIC PROJECT APPROVAL (HPA) (March 29, 2021, 10:00 AM), https://wdfw.wa.gov/licenses/environmental/hpa/application/assistance. Only after BIAW members violated the relevant statute would the possibility of fines arise, after WDFW decided which of its several enforcement mechanisms to apply. *See* WAC 220-660-480.

BIAW's evidence of harm amounts to speculation as to whether their future customers will turn down projects based on alleged "insecurity and uncertainty" as to the maximum penalty amount. But BIAW has presented no evidence that it has actually lost or is threatened to lose a

bid or a contract as a result of the Governor's veto. Thus, we hold BIAW's bare allegation of "insecurity and uncertainty" does not amount to an injury in fact for purposes of standing.

BIAW has only raised theoretical injuries. Because BIAW has not shown that the Governor's veto has harmed or threatens to harm its financial interests, we hold that "insecurity and uncertainty" alleged here does not amount to an injury in fact.

C. *Procedural or Constitutional Injury*

BIAW next argues that it has standing under its newly proposed rule because the Governor's veto of Subsection 8(1)(a) is both procedural and constitutional in nature. BIAW asks us to adopt a rule that "those who are governed by a law that was unconstitutionally created have suffered sufficient harm to challenge that law, even before the effect of the law is felt." Br. of Appellant at 19. BIAW seeks to expand the procedural injury requirement to confer standing upon all those who may be subject to a law that was unconstitutionally implemented. We disagree and decline to adopt such a rule.

When a claimed injury is procedural in nature, the standing requirements are relaxed. *Seattle Bldg. & Constr. Trades Council v. Apprenticeship & Training Council*, 129 Wn.2d 787, 794-95, 920 P.2d 581 (1996). A litigant claiming a procedural injury must "(1) identify a constitutional or statutory procedural right that the government has allegedly violated, (2) demonstrate a reasonable probability that the deprivation of the procedural right will threaten a concrete interest of the party's, and (3) show that the party's interest is one protected by the statute or constitution." *Five Corners Family Farmers v. State*, 173 Wn.2d 296, 303, 268 P.3d 892 (2011).

BIAW cites *Washington Federation of State Employees v. State*, 101 Wn.2d 536, 682 P.2d 869 (1984), to support its proposition that we should expand the standing requirements. But *Washington Federation* does not support BIAW's argument. In that case, a labor union challenged the validity of Governor Spellman's veto of a bill that sought to change the state civil service laws to allow seniority and performance evaluations to determine compensation and employment decisions. *Wash. Fed'n of State Emps.*, 101 Wn.2d at 538-39. Governor Spellman vetoed Section 30 of that bill, which would have required legislative oversight over agency implementation of the performance evaluation process. *Wash. Fed'n of State Emps.*, 101 Wn.2d at 551 (Rosellini, J., dissenting). Our Supreme Court reached the merits of the claim to uphold the Governor's veto, but did not address questions of standing or justiciability directly. *Wash. Fed'n of State Emps.*, 101 Wn.2d at 547.

BIAW states that our Supreme Court in *Washington Federation* "allowed the union to challenge the law because the Court trusted the union to define what harmed its members and because judges need not forgo common sense when establishing standing." Br. of Appellant at 21-22. BIAW apparently reaches this conclusion entirely by inference because our Supreme Court in *Washington Federation* is silent on the issue of standing in its opinion. This is because that case came before the court as a direct review under RAP 4.2 of a summary judgment decision from the superior court that also reached the merits of the case. *Wash. Fed'n of State Emps.*, 101 Wn.2d at 539. *Washington Federation* is not analogous to the standing issue before us because no standing issue was before our Supreme Court. *Washington Federation*'s silence on the issue of standing does not ipso facto support the existence of an inherent statutory or procedural right.

17

Other than *Washington Federation*, BIAW does not present further discussion or authority on the issue of procedural injury for purposes of standing. BIAW does not identify the statutory procedural or constitutional right it claims is at stake by this alleged procedural injury, so they fail the first prong of the test for procedural injury.

Here, the mere fact that BIAW is governed by the statute in question does not bestow a constitutional right upon BIAW. BIAW has no more right against the Governor's use of an alleged unconstitutional veto than any other private party. Adopting BIAW's proposed rule is unsupported, impracticable, and would pry open the flood gates to constitutional challenges beyond the prudential limits of our law of standing. We decline to expand the standing requirements as suggested by BIAW.

D. *Substantial Public Importance*

BIAW argues that even if it does not have standing, we should proceed to the merits of this case because it is an issue of public importance that is resolvable on adequate briefings. We disagree and decline to do so.

Where there is no standing under the UDJA, "'the court steps into the prohibited area of advisory opinions,'" which we issue only in rare circumstances. *To–Ro Trade Shows*, 144 Wn.2d at 416 (quoting *Diversified Indus. Dev. Corp. v. Ripley*, 82 Wn.2d 811, 815, 514 P.2d 137 (1973)). "[W]hen a controversy is of substantial public importance, immediately affects significant segments of the population, and has a direct bearing on commerce, finance, labor, industry, or agriculture" appellate courts have been willing to take a "'less rigid and more liberal' approach to standing." *Grant County* II, 150 Wn.2d at 803 (quoting *Wash. Nat. Gas Co. v. Pub. Util. Dist. No. 1 of Snohomish County*, 77 Wn.2d 94, 96, 459 P.2d 633 (1969)). We apply the

substantial public importance exception only in rare cases where the public's interest is overwhelming and the issue has been adequately briefed and argued. *To–Ro Trade Shows*, 144 Wn.2d at 416.

BIAW cites to *Rocha v. King County*, 195 Wn.2d 412, 420, 460 P.3d 624 (2020), for the proposition that its case is one of significant public interest. But *Rocha* is distinguishable. In *Rocha*, a class action and declaratory judgment action brought by jurors against King County asserted that (1) they were employees entitled to minimum wage as defined by the Minimum Wage Act, chapter 49.46 RCW, and (2) they had an implied cause of action under RCW 2.36.080.[13] 195 Wn.2d at 416, 418. The trial court granted summary judgment in favor of the County and we affirmed. *Rocha*, 195 Wn.2d at 419. Our Supreme Court reached the merits of the jurors' claims, holding that the jurors had standing under the UDJA. *Rocha*, 195 Wn.2d at 419. Our Supreme Court reasoned that because the claims were premised on the existence of asserted statutory rights, the court "must analyze the merits of petitioners' arguments to determine whether petitioners have rights that could be asserted in a UDJA claim." *Rocha*, 195 Wn.2d at 420. In contrast here, unlike the jurors in *Rocha*, BIAW's claims are not premised on the existence of statutory rights.

We decline to reach the merits of this case without finding proper standing for declaratory relief because the validity of a veto that may or may not impact only a narrow class of homebuilders is not a matter of "'broad overriding public import.'" *To–Ro Trade Shows* 144

---

[13] RCW 2.36.080 states in relevant part that a citizen shall not be excluded from jury service on account of economic status. The jurors in *Rocha* alleged that the low compensation for jury service had a disparate impact on low-income jurors. 195 Wn.2d at 418.

Wn.2d at 416 (quoting *Diversified Indus. Dev. Corp.*, 82 Wn.2d at 814. BIAW's claims are premised on a claim of an unconstitutional Governor's veto. No right is at stake here, statutory, constitutional, or otherwise, that could be asserted in a UDJA claim in this case.

Thus, we hold BIAW does not have standing to bring its claim under the UDJA and that that the issue raised in this case is not of substantial public import.

CONCLUSION

We hold that BIAW does not have standing to bring its claim under the UDJA because it has not demonstrated an injury in fact. We decline to adopt a rule of relaxed justiciability or consider this as a case of substantial public import. Consequently, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Worswick, J.

We concur:

_____, C.J.
Lee, C.J.

_____
Veljacic, J.